**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| C.G. AND B.G., individually, and on behalf of their minor child, A.G., § § § § § Plaintiffs, § § vs. § § CHEATHAM COUNTY § BOARD OF EDUCATION, and § § CHIP RONEY, individually § § Defendant. § § | Case No. _____ JURY DEMANDED |

## COMPLAINT

**COME THE PLAINTIFFS, C.G. AND B.G,** by themselves and on behalf of their minor child, **A.G.,** and file this Complaint against the Defendant, **CHEATHAM COUNTY BOARD OF EDUCATION**, and **CHIP RONEY, individually.** They show:

### I. PARTIES, JURISDICTION, AND VENUE

1. Plaintiffs, **C.G., B.G, and A.G.** ("Plaintiffs") are citizens and residents of Ashland City, Tennessee.

2. Defendant, **CHEATHAM COUNTY BOARD OF EDUCATION**, ("Cheatham County") is an employer operating in Cheatham County, Tennessee who, acting under color of law, deprived Plaintiffs of a Constitutional right as set forth herein below. **CHIP RONEY** is an individual who resides and works in Cheatham County, and is the acting principal of the Ashland

1

City Elementary School. Suit is brought against him in his individual capacity. As shown below, Roney misused power made possible because of the authority of his position, and acted under color of state law.

3. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

4. This action also arises under the following federal statutes: The Americans with Disabilities Act of 1990 (ADA), Pub.L. No. 101-336, 104 Stat. 327 (1990), 42 U.S.C. §§ 12101 et seq., amended by the Americans with Disabilities Amendments Act (ADA-AA) with an effective date of January 1, 2009, the Rehabilitation Act of 1973, §§504 and 505, as amended, 29 U.S.C.A. §§794 and 794a, including the conforming amendment of the ADA-AA which changes the definition of "disability" under §504 to conform to the definition of "disability" under ADA-AA. Both the ADA and §504 prohibit retaliation against persons with disabilities, or persons who advocate on behalf of a student's education. Additionally, this action also arises under the First Amendment to the United States Constitution and 42 U.S.C. §1983.

5. Venue is proper because the alleged acts in this lawsuit occurred in this judicial district and/or because the Defendant conducts business in this judicial district.

6. Cheatham County Schools, including Ashland City Elementary School, are the beneficiaries of federal funding subject to Section 504 of the Rehabilitation Act and are therefore covered by the Act.

## II. FACTUAL BASES FOR SUIT

7. According to a study released in 2013 by the Centers for Disease Control and Prevention, food allergies among children increased approximately 50% between 1997 and 2011. Food allergies result in more than 300,000 ambulatory-care visits a year among children under the age of 18. Food allergy is the leading cause of anaphylaxis outside the hospital setting. Thus,

this generation's educational leaders' attitudes toward these challenges and cautions is important.

8. Plaintiffs' daughter, A.G., is a minor who is currently 7 years old. She has a severe peanut allergy which is medically treated. As her physicians explain it: The allergy is "a severe, potentially life-threatening peanut allergy. She is at high risk for an anaphylactic reaction if she is allowed to come into contact with peanuts"… and "there is a very good chance that contact or airborne exposure to peanuts can trigger allergic reactions with her."

9. This impairment is a covered "disability" as that term of art is defined by Section 504 and the ADA, with amendments (ADAAA). Due to a severe peanut allergy, when active, Plaintiffs' daughter is substantially limited in major life activities such as eating, digesting, breathing, and with respect to bodily systems such as her circulatory and respiratory systems. Ingestion or even contact with peanuts can cause her itching, hives, swelling, and serious illness.

10. The contact with peanuts is a danger in an educational setting. The school cafeteria is one example, but the classroom (where kids may bring peanuts, Reese's peanut butter cups, or candies with nut products) is another.

11. In July of 2014, Plaintiffs provided a letter from A.G.'s physician outlining the nature of her disability and the accommodations and modifications she will require. (See Exhibit A hereto). This letter required a "designated peanut-free table in the school cafeteria," among numerous other items, and stated that "[n]otice should be provided to student body informing parents that there are students that have food allergies to peanut and tree nut and related products." (Id.) Additionally, training of students and staff was recommended. (Id.)

12. In August of 2014, when she first enrolled for school, Cheatham County and Plaintiffs wrote a Section 504 Plan for A.G. Therefore, the parties agreed that A.G. had a "disability" as defined by 504 (and the ADA). This Plan addressed school precautions with

3

respect to nuts, as well as established a "nut free table" in the cafeteria. A.G., along with students who purchased or brought a nut-free meal may sit at the table, too, thereby avoiding isolation of A.G. from peers.

13. In August of 2014, some disputes arose between Cheatham County and Plaintiffs as to whether the 504 Plan accurately reflected the necessary modifications, supports or aids. This necessitated a second meeting to review and address terms of the Section 504 Plan. Throughout September, Plaintiffs voiced their concerns about proper implementation of the Section 504 Plan to school officials. On or about September 28, 2014, Plaintiffs addressed concerns they had about Cheatham County failing to follow the 504 Plan to school officials.

14. Plaintiffs tried to work with Cheatham County to balance the need for a "peanut free" environment for their child, on the one hand, versus the risk of "isolating" her from all of her classmates, as if she had done something wrong and must sit by herself. The balance to be struck, they explained, was a peanut free table where many children, not just A.G., could feel comfortable.

15. On or about September 30, 2014, C.G. telephoned Cheatham County's principal, Chip Roney to discuss, *inter alia*, proper protocol in the event of exposure to peanut products. C.G. explained the protocol for exposure was not always to just send her home. Rather, cleaning A.G.'s skin and accessing the change-of-clothes in her backpack would be appropriate in the event of a mild reaction. This cleansing and change-of-clothes would eliminate the trace residue of peanut protein on A.G.'s skin and clothing, and she would not miss educational time by being sent home.

16. Additionally, C.G. suggested to Roney that consideration be given to extracurricular events, such as school fundraisers, so that A.G. could participate. C.G. had begun

contacting the school board to facilitate these efforts as well.

17. Roney became angry at the subject of allergies and accommodations, as if the matter were a nuisance, that he should not be bothered by it, and that C.G. was trying to create trouble. Roney and, by extension, Cheatham County Board of Education, began engaging in a pattern and practice of resistance—a custom, practice, or policy of retaliation.

18. Later that day, September 30, 2014, the State of Tennessee's Department of Children's Services arrived at Plaintiffs' home. The DCS investigator advised the father, B.G., that a complaint of <u>severe child abuse</u>, known as "Munchausen by Proxy," had been made against the parents, accusing them of abusing their own daughter, A.G. Separately, the investigator also advised the mother, C.G., by phone, that a complaint of severe child abuse (Munchausen by Proxy) had been made against them, accusing them of abusing their own daughter, A.G.

19. It was clear from context that the accusation—false as it was—had been made or suggested by someone at A.G.'s school.

20. A second home visit, an inspection, was required by DCS. Penalties for child abuse, if found by the Department of Children's Services, can include removal of all children from the parents—a horrifying proposition for any caring parents and, certainly, for the Plaintiffs.

21. C.G. and B.G.'s actions toward A.G.—doctor's appointments, treatments, counseling with school, working through a 504 Plan, and demonstrating love for their daughter—are the polar opposite of child abuse. Plaintiffs' injuries from the false accusation are "non-educational," thus not requiring administrative exhaustion.

22. DCS, after investigating, found the report against Plaintiffs utterly

5

unsubstantiated.

23. A.G.'s 504 Plan, as well as letters from A.G.'s physician, required education of others concerning peanut allergies in an educational environment. Plaintiffs continued their efforts in October and, on or about November 4, 2014, Plaintiffs went to the Superintendent and School Board to present the CDC's "Voluntary Guidelines for Managing Food Allergies in Early Care and Education Centers," released in 2013. As the title indicates, this explains management of food allergies in educational environments, while also explaining how children like A.G. with nut allergies may be covered by Section 504 and the Americans with Disabilities Act.

24. As for education within the classroom environment, on October 31, 2014, during a Halloween visit, Plaintiff's mother openly handed out a page created by "Food Allergy Resource and Education" (FARE). This one-page flyer featured two kids holding hands and said: "Food allergies are serious and they affect 1 in 13 kids. To learn more about food allergies, visit [www.foodallergy.org](www.foodallergy.org)." On the flyer, Plaintiff's mother wrote in handwriting, "Be a lunch buddy at the peanut free table." (See Exhibit B hereto).

25. On or about November 6, 2014, the principal, Chip Roney, telephoned A.G.'s mother at her work. This call was recorded.

26. On the call, Roney demanded to know whether Plaintiff's mother had distributed the form from FARE without getting permission.

27. Plaintiff's mother stated that, yes, she had distributed the form. But she had done so quite openly in the teacher's presence, like handing out birthday party announcements to the kids, and did not know formal approval was required.

28. Roney claimed it was against "board policy" for Plaintiff's mother to pass out the flyer from FARE. Plaintiff's mother said she had no idea that she had violated any such policy.

6

29. Roney stated that she had. Instead of simply giving the policy or having a decent discussion, Roney said that he was punishing A.G.'s mother and father with a ban from coming onto school property which Roney said would be in effect "from here to ever after."

30. Acting as if Plaintiff's mother had given something subversive instead of educational, Roney stated that he "can't tell you how upset he was that he kids were exposed [to the flyer]."

31. Roney stated that nothing could be handed out in class-not even birthday invitations to a birthday party.

32. Roney said that the simple educational flyer from FARE had "baffled everyone's mind."

33. Demonstrating his outright hostility, Roney said it amounted to **"peanut free propaganda."**

34. However, peanut allergies, and the educational information, are most assuredly not "propaganda." These allergies can be life threatening, and certainly can and do cause great sickness. Roney's statements reflect his own profound ignorance and hostility.

35. Further demonstrating his hostility, Roney said that Plaintiff's advocacy and attempts at education about peanut allergies amounted to "harassment." Roney reiterated that it was "harassment" of parents and amounted to "propaganda."

36. Parents of children with severe allergies must speak up to protect their children. Parents without children with such allergies, or who have not been exposed to these situations, may simply not know. They, too, must receive education. Thus, Roney's sentiments are backward and ignorant.

37. Roney said such advocacy and education by Plaintiff's mother would not be

tolerated.

38. Getting louder and more menacing, Roney asked Plaintiff's mother if she understood what he meant, and how she was barred from the school.

39. Roney stated that Plaintiff's mother, unlike other parents, could no longer eat lunch with her children at school. Roney told her that was a privilege, not a right, and, treating her as if she were a child, stated that she had lost her privilege. He stated that her privilege of eating lunch with her children was <u>revoked.</u>

40. Roney stated that Plaintiff's mother's actions were "not very intelligent."

41. In truth and fact, Chip Roney, as a principal to children, needs anger management, instruction and oversight, training in how to de-escalate situations, and what constitutes bullying behavior—particularly toward vulnerable persons and/or persons who challenge his belief-systems.

42. Plaintiff's parents reasonably feared for their children's well-being and that of other children with food allergies. These fears were objective and, a reasonable person in their shoes, would have felt likewise been dissuaded from engaging in further protected activities due to false accusations and being banned from the school. Plaintiffs' fears were informed by: (a) threatening language and mannerisms of Roney; (b) a false allegation emanating from the school; (c) Roney's banning the parents from the property; (d) reports that Roney had a history of confrontation when challenged, to the point of being arrested for it; and (e) Roney (and therefore the school's) disbelief concerning A.G.'s needs and the needs of children with severe peanut allergies ("propaganda"). Accordingly, for these reasons, Plaintiffs feared for their child's ongoing safety, and their rights as parents, and have had to secure their children from the public school system and bear the costs of their education.

43. In response to Plaintiffs' aforementioned legally protected concerns under both the First Amendment and Section 504 as well as the ADA, Cheatham County, acting under color of state law to deprive Plaintiffs of their rights secured by federal law, did engage in a pattern of retaliation against Plaintiffs either from a policy or custom or were undertaken by employees with final policymaking authority of indifference to the rights of children with disabilities, including food allergies. Said pattern of retaliation was in bad faith, taken in deliberate indifference to Plaintiffs' rights. Plaintiffs' speech outlined above is protected conduct under Section 504 and the ADA, as well as a "public concern" relating to managing food allergies. "Retaliation" is alleged because Plaintiffs engaged in constitutionally and statutorily protected activities; adverse action was taken against them in the form of DCS accusations and banning them from the school; these actions that would deter a person of ordinary firmness; and such adverse actions were in fact causally connected to the protected conduct identified above.

## IV. LEGAL CAUSES OF ACTION

44. Based upon the foregoing, incorporated herein, Plaintiffs bring the following causes of action against Defendant Cheatham County School System:

**A.** **Retaliation and Retaliatory Harassment/Hostile Environment Under §504 of the Rehabilitation Act, 29 U.S.C. §794;**

**B.** **Retaliation and Retaliatory Harassment/Hostile Environment Under the Americans with Disabilities Act, with Amendments; and**

**C.** **Retaliation and Retaliatory Harassment/Hostile Environment Under the First Amendment to the Constitution and Section 1983**

45. Plaintiffs bring the following causes of action against Defendant Chip Roney:

**A.** **Retaliation and Retaliatory Harassment/Hostile Environment Under the**

9

**First Amendment to the Constitution and Section 1983**.

46. Plaintiffs demand a jury.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs requests:

A) Defendant Answer this Complaint within the time period prescribed by law;

B) That the Court award permanent injunctive relief to include a safe school environment free of retaliation (and Defendant Roney);

C) That Plaintiffs be Awarded damages to include pain and suffering and/or humiliation/embarrassment or other compensatory damages, any actual monetary losses occasioned by the retaliation, and their reasonable attorneys fees and costs per applicable statutes; and

D) Additionally, against Defendant Roney, punitive damages.

Respectfully submitted,

**GILBERT RUSSELL McWHERTER SCOTT BOBBITT PLC**

/s Justin S. Gilbert
Justin S. Gilbert (TN Bar No. 017079)
341 Cool Springs Blvd Suite 230
Franklin Tennessee 37067
Telephone: 615.354.1144
Facsimile: 731-664-1540
jgilbert@gilbertfirm.com

Jessica F. Salonus (TN Bar No. 28158)
101 North Highland Avenue
Jackson, Tennessee 38301
Telephone: 731-664-1340
Facsimile: 731-664-1540
jsalonus@gilbertfirm.com